Diana L. FYFFE and Stephen R. Pierce, Appellants,

v.

Pattie WRIGHT, Ken Gill, Rick Fickel, and Kelly Fickel, Appellees.

No. S–10726.

Supreme Court of Alaska.

June 25, 2004.

Rehearing Denied July 21, 2004.

67. *RAN Corp. v. Hudesman*, 823 P.2d 646, 649 (Alaska 1991).

Diana L. Fyffe, pro se

Stephen R. Pierce, pro se.

Wayne E. Watson, Anchorage, for Appellee Pattie Wright.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Diana Fyffe sued her former landlord, Pattie Wright, for multiple violations of Alaska's landlord-tenant laws. Wright counterclaimed for damage to the rental property and unpaid rent. The superior court found fault on both sides and awarded damages to Fyffe, considerably offset by the money it found Fyffe owed Wright. Fyffe appeals, contending that the superior court should have awarded her more compensation than it did for her belongings, for punitive damages, for Wright's alleged intentional infliction of emotional distress, and for costs and fees. Fyffe also contends that Wright's violation of Alaska landlord-tenant law should have precluded offsetting Fyffe's award. We affirm the superior court's decision in all respects.

## II. FACTS AND PROCEEDINGS

### A. Facts

Patti Wright owned a home in Chugiak. In late 1995 Wright signed a lease agreement to rent the home to Diana Fyffe and Stephen Pierce (sometimes referred to collectively as Fyffe), who were married at the time. Fyffe and Pierce moved into the home with their two teenage children, Samantha and Timothy. The lease provided that upon termination all rent owed to the landlord had to be paid before the tenant removed any belongings from the property. The rent was set at $1,000 per month. There was a $35 fee for bounced rent checks, and a $100 fee for any monthly rent not received by the 15th day of the month—plus a $10 charge for every additional day the rent was unpaid. The house was in disrepair when Fyffe and Pierce moved in, but because Pierce had prior experience in construction work they agreed to clean and refurbish it themselves in exchange for a reduction in rent. Fyffe also asked for and received permission to keep animals outside the house. Pierce was working in a different city when his family moved in, and they were assisted by Rick Fickle, an acquaintance.

Pierce and Fyffe divorced in October 1997, but for a time maintained good relations, continuing to share the home and "act as a financial unit." However, Pierce spent most of his time working in Valdez until the spring of 1998, when Fyffe moved to South Carolina and Pierce returned to the Chugiak home. At about that time, Pierce notified Wright that the family intended to vacate the house that spring or summer. Pierce put Wright in touch with Fickle; Wright and Fickle agreed that Fickle would rent the property and move into the house after Fyffe's family left.

Pierce and Fickle apparently reached an oral agreement during the month of August that Pierce would leave some of the family's personal property in a locked storage shed on the property. Before moving out of the house in early September 1998, Pierce and his two children boxed up many of the family's belongings and stored them in the shed, though without making a list of the items stored. Additionally, the family left an old car on the property and stored four tires and some of Samantha's equestrian equipment inside it. Fyffe admitted that by the time her family vacated the home, they owed five months' rent to Wright.

Wright claimed she never visited the house herself after Pierce moved out. But Fickle reported that the house was left with extensive damage, including the remains of dead ferrets and animal urine and feces; a nonworking septic system; and damage to a door and the backyard done by Fyffe's dogs. Wright agreed to waive Fickle's first three months of rent, worth a total of $3,000, in exchange for his cleaning and repair of the house.

Wright claimed that when the Fyffe/Pierce family moved out of the Chugiak house, she was "desperately" trying to contact Fyffe and Pierce to discuss damages and back rent, but that Fyffe had not given her the family's new contact information and was avoiding her. On September 17, 1998 Wright wrote to Pierce. She mentioned the damages and back rent due, and warned that if Fyffe's

personal items left on the property were not removed within fifteen days Wright would dispose of them. Roughly one week after her family moved out of the Chugiak residence, Samantha entered the property without permission from Fickle or Wright. She retrieved her farrier equipment and winter tires from the car that her family had left at the house.

Fyffe returned to Alaska in September 1998. On several occasions after her return, Fyffe requested access to the property from Fickle or Wright in order to retrieve her personal items. But Fyffe did not actually make a physical attempt to retrieve her property until November 20 of that year. Fickle refused to allow Fyffe onto the property.[1] After she was denied access to the property to retrieve her belongings, Fyffe began to make lists of the personal property allegedly withheld by Wright and Fickle. Fyffe constructed the lists based on her own memory of the possessions, as well as the recollections of Pierce, Tim, and Samantha, who had boxed the items (since Fyffe was not present when the belongings were packed and stored).

Fyffe claims that from September 20, 1998 until March or April of 1999 she and Pierce repeatedly and fruitlessly attempted to contact Wright and her husband Ken Gill at their home. Wright and Gill said that until Fyffe paid $10,000 in back rent, a $10 per day late rent fee, "and everything" she owed (apparently for damage to the property) she would not be able to get back her belongings. Gill indicated that the items were in storage. Meanwhile, according to Fickle, at some point that spring, Gill apparently removed the entire shed and its contents from the property.

Fyffe eventually saw a lawyer and discussed suing Wright to gain access to the property. Wright apparently told Fyffe or

her lawyer that Wright and Gill had considered the items remaining on the property to be abandoned, and had taken them to the Salvation Army. Fyffe unsuccessfully searched the Salvation Army and the thrift stores in town for the family's property or any record of anything left by Wright or Gill.

## B. Proceedings

Fyffe brought suit against Wright in superior court,[2] asserting that the actions taken by Wright violated numerous Alaska landlord-tenant laws. Fyffe demanded compensation for any property not returned, the expense of renting equipment in her thwarted attempts to retrieve the property, "nontangible damages including ... time loss in researching this action, malicious intent, mental distress," and litigation costs and fees.

Fyffe sought to introduce itemized lists that she had made of the shed's contents, setting out the alleged value of each item. Fyffe had had no idea of the monetary value of many of the items when she compiled the lists, so she deduced values by comparing her list with equivalent items in catalogs or thrift stores. In light of what it viewed as Fyffe's questionable estimation methods, the superior court decided to admit the lists primarily to identify the items for which Fyffe sought compensation, and not as definitive proof of their values. Wright introduced exhibits evidencing the rent, late fees, and repair costs that she claimed. The court pointedly asked all parties if they had any objections to the admission of these exhibits, and no party objected.

Following a one-day bench trial, the superior court made preliminary findings of fact. The court asked the parties to submit additional briefing on the legal issue whether Fyffe could recover damages for emotional distress stemming from the loss of personal

---

1. The parties argued strenuously about whether Fickle was acting at the behest of Wright or was motivated by his own disdain for Fyffe. Because the dispute is irrelevant to the outcome of the case, we do not attempt to resolve it.

2. Fyffe also sued Fickle in small claims court over related property claims. The cases were consolidated in superior court. Upon making

preliminary findings of fact at the conclusion of the trial, the court found that the only property Fickle owed to Fyffe was a large world globe and its stand. Fickle agreed to return this item, and proclaimed that he only wanted the other parties in the case to leave him alone in the future. There is no indication that Fickle played any further role in this case.

property. The court later held that Ken Gill did not own the Chugiak residence, but acted as Wright's agent, and that Wright was legally accountable for Gill's actions in connection with Fyffe's property. The court also held that Wright, acting through Gill, "caused the destruction and disposition of the plaintiffs' personal property" without providing notice to Fyffe, as required by AS 34.03.260. That statute provides that a landlord who fails to give notice to a tenant of disposition or sale of the tenant's property that the landlord deems abandoned is liable for actual damages, and penal damages in an amount not to exceed actual damages.

Fyffe claimed $23,542.80 in total damages. The superior court awarded Fyffe $9,461.30 [3] in actual damages and $5,000 in punitive damages.[4] However, the superior court also concluded that Fyffe's award should be offset by certain moneys rightfully claimed by Wright. Specifically, the court concluded that: (1) Fyffe owed Wright a total of $5,250 in unpaid rent; (2) Fyffe owed Wright a total of $140 for four bounced rent checks, each with a $35 penalty; (3) the $100 penalty for rent tendered later than the 15th of the month was unreasonable and should be reduced retroactively to $50—which, when multiplied by the eighteen times Fyffe missed the deadline, amounted to $900; [5] and (4) Fyffe owed Wright $3,000 for damages done to the property. Additionally, the court found that Fyffe had paid Wright a total of $814 of the money she owed. Adding the $5,250, $140, $900, and $3,000, and subtracting the $814, the court found that Fyffe and Pierce owed Wright a total of $8,476; it reduced the plaintiffs' award accordingly. The court refused to award anything to Fyffe for her emotional distress claim because it found that Fyffe had not proven that her distress was sufficiently severe. The court did not address Fyffe's other claims for relief. Combining the total damages to Fyffe and Pierce, and subtracting the damages to Wright, the court held that the plaintiffs were entitled to a total of $5,985.30, and entered judgment accordingly.[6]

Following the superior court's decision, Fyffe filed several post-trial motions: a motion to dismiss the evidence and testimony of the defendants, a motion for a new hearing of fact, a motion for alteration and amendment of the superior court's written decision, and a motion for a new trial. The court denied all of Fyffe's post-trial motions. Fyffe appeals the court's award of damages and its denial of the post-trial motions.

## III. STANDARD OF REVIEW

▮▮▮ We review the superior court's application of the law to undisputed facts under the *de novo* standard.[7] We review the superior court's findings of fact and its application of the law to disputed facts under the "clearly erroneous" standard.[8] Under that standard, we must have a definite and firm conviction that a mistake was made before rejecting a trial court's factual findings.[9] Additionally, it is the function of the superior court, not of this court, to judge witness credibility and to weigh conflicting evidence.[10] Thus, if most of the evidence is oral

---

3. The court apparently made an insignificant mathematical error; the sum of Fyffe's actual damages should have been $9,451.30, based on the valuation of each specific item of Fyffe's property.

4. The court stated that it based this award on AS 34.03.270. This was a typographical or scrivener's error. That statute deals with awards to landlords for past rent due and damages. The court apparently meant to cite (as it did earlier in its decision) AS 34.03.260, which allows a court to award penal damages to a tenant not in excess of actual damages.

5. The court also found that the $10–per–day fee for each additional day rent was tendered beyond the 15th of the month was unreasonable and should be ignored.

6. The ten dollar error in the court's calculation of Fyffe's actual damages was carried over to the final judgment; in fact, Fyffe and Pierce should only have been awarded $5,975.30.

7. *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1223 (Alaska 1992).

8. *Id.*

9. *Vezey v. Green*, 35 P.3d 14, 19–20 (Alaska 2001).

10. *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001).

testimony, or the superior court's factual determinations depend largely on conflicting testimony, then the superior court's greater ability to assess witness credibility requires deferential review by this court.[11] We review *de novo* the law applied by a trial court in determining damages, but review the damages actually awarded for abuse of discretion.[12]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err in Considering Exhibit B.

Fyffe argues that the superior court erred in allowing an offset against her recovery. The superior court based its offsetting calculation at least in part on "Exhibit B," submitted by Wright.  Exhibit B itemizes the amounts of money Fyffe allegedly owed to Wright, and is fairly specific as to unpaid rent, late fees, and bounced checks.  However, Exhibit B also summarizes all alleged damage to the property caused by Fyffe in one figure: $3,000.  Wright explained at trial that this represents the three months of rent she forgave Fickle in exchange for his agreement to fix and clean the property.

Fyffe's argument on this point contains three main contentions: (1) although Fyffe did not object to the admission of Exhibit B at trial, her right to object in subsequent procedures was preserved; (2) even if Fyffe's right to object to Exhibit B was waived, the superior court should not have admitted Exhibit B into evidence; and (3) even if Exhibit B was properly admitted into evidence, the court erred in relying on Exhibit B to reduce Fyffe's damages, because Wright violated AS 34.03.070(b) and other laws.  Fyffe is mistaken as to all three contentions.

### 1.  Fyffe waived her right to object to the admission of Exhibit B.

■ Alaska Rule of Evidence 103(a)(1) provides that error may not be based upon a ruling admitting or excluding evidence unless a substantial right of a party is affected and "a timely objection or motion to strike appears of record."  When a party fails to object to the admission of evidence, that party waives the objection.[13]  By her own admission, Fyffe made no objection to Exhibit B at trial.  Under these circumstances, Fyffe waived her objection to Exhibit B.

Fyffe also claims that Wright failed to disclose Exhibit B during discovery and, as a result, Fyffe was "not prepared to litigate the entire rental history or provide an adequate defense."  If Fyffe believed that Wright violated the rules of discovery by failing to disclose Exhibit B or the evidence underlying it before trial, it was Fyffe's responsibility to move to compel disclosure under Alaska Rule of Civil Procedure 37(a)(2). Fyffe was represented by counsel before and at trial, and at no time did Fyffe's attorney move to compel disclosure.  Fyffe cannot now object to the admission of Exhibit B.

### 2.  The superior court did not err in admitting Exhibit B.

■ Only where the admission of evidence constitutes "plain error," and affects a "substantial right" is the failure to object to the evidence excused.[14]  "To establish plain error a litigant must ... establish that the application of that rule of law to the facts of his case was so obvious that it should have been noticed by the trial court sua sponte."[15]  The appellant bears the burden of proving plain error.[16]  Fyffe has not met her burden of proving that the evidence in Exhibit B was so manifestly improper that the superior court should have excluded the exhibit *sua sponte.*

### 3.  The superior court did not err in relying on Exhibit B.

■ Fyffe also argues that even if Exhibit B was properly admitted and all

11.  *Vezey,* 35 P.3d at 19–20.

12.  *Breck v. Moore,* 910 P.2d 599, 606 (Alaska 1996).

13.  *Sherbahn v. Kerkove,* 987 P.2d 195, 199 (Alaska 1999).

14.  Alaska R. of Evid. 103(d).

15.  *Carman v. State,* 658 P.2d 131, 137 (Alaska App.1983).

16.  *Adams v. State,* 718 P.2d 164, 166 (Alaska App.1986).

objections to it waived, it was legal error to rely on Exhibit B. If we read Fyffe's brief under a generous *pro se* standard,[17] it appears that Fyffe is arguing that despite her failure to object at trial, her complaint and trial briefings discussed numerous provisions of landlord-tenant law that Wright violated. Fyffe suggests that by violating these statutes, Wright waived her right to offset the damages she owes Fyffe. Therefore, Fyffe appears to argue that even if it was properly admitted, Exhibit B is irrelevant.

Fyffe seems to imply that a civil defendant's failure to comply with the law as it applies to other aspects of a dispute between the parties bars that defendant from introducing evidence in her favor or from seeking to reduce the amount of damages for which she will be held liable. To the extent that this is in fact what Fyffe argues, such a contention contradicts the most basic notions of fairness and due process. Wright's alleged violation of one statute does not preclude her from introducing evidence concerning damages or raising a counterclaim.

■ Fyffe makes the related argument that Exhibit B was inadmissible because it does not conform to requirements of AS 34.03.070(b).[18] The crux of Fyffe's argument is that AS 34.03.070 completely controls the procedure a landlord must follow to recover damages caused by a tenant. Fyffe argues that *any* possible recovery by a landlord for damages to property, even in the form of offsetting damages that a landlord must pay to a former tenant, must be itemized and sent to the tenant within the statutory period. According to Fyffe, "[t]here was no itemized list of charges properly served to the Appellants within the 30 days [prescribed] by law; therefore Wright is not entitled to recover any damages under AS 34.03.070(b)."

Fyffe reads the statute far too broadly. It regulates only a landlord's ability to deduct damages and unpaid rent from a tenant's security deposit. It is not an instruction to a reviewing court as to how to measure the damages the landlord and tenant owe each other. The superior court was under no obligation to demand from Wright an itemized list of the specific physical harms to her property that Fyffe allegedly caused, nor was it barred from reducing Fyffe's damage award by inadequacies in Wright's notice or itemization of damages. The court did not err in relying on Exhibit B.

## B. The Superior Court's Property Evaluations Were Not Clearly Erroneous.

Fyffe argues on appeal that "[t]he Superior Court was clearly erroneous, and committed a serious miscarriage of justice when it evaluated the Appellant's chattels." Fyffe lists numerous points of error by the superior court, generally asserting that the superior court: (1) based its decision on faulty fact-finding, credibility determinations, and evaluations of evidence; (2) made unfair or incorrect decisions to admit or bar evidence; (3) issued a written decision "contrary to the summary of its decision at trial"; and (4) "grossly misinterpret[ed] the request for relief in the original complaint." Most of these claims consist of assertions that the superior court misevaluated evidence, witness credibility, and facts. As noted above, we review a superior court's findings regarding property evaluation and disposition under the clearly erroneous standard.

### 1. Exhibit 1

■ Fyffe argues that the superior court erred in its award of damages for items she listed in "Exhibit 1." Exhibit 1 consisted of "personal belongings" of Samantha Fyffe—

---

17. We hold the pleadings of *pro se* litigants to a less stringent standard than those of lawyers. *Pieper v. Musarra,* 956 P.2d 444, 446 (Alaska 1998).

18. AS 34.03.070(b) states in relevant part:
Upon termination of the tenancy, property or money held by the landlord as prepaid rent or as a security deposit may be applied to the payment of accrued rent and the amount of

damages that the landlord has suffered by reason of the tenant's noncompliance with AS 34.03.120. The accrued rent and damages must be itemized by the landlord in a written notice mailed to the tenant's last known address within the time limit prescribed by (g) of this section, together with the amount due the tenant.

Schmidt[19] and Timothy Fyffe.[20] The superior court found that Fyffe failed to prove by a preponderance of the evidence that Samantha's items left in the car (farrier equipment and winter tires) were destroyed or removed by Wright, because of Fickle's testimony that Samantha had retrieved personal items from the car. And the court relied on Pierce's testimony that he had taken Tim's belongings to Anchorage in rejecting Fyffe's claim for reimbursement on those items. The court therefore awarded Fyffe nothing for the items in Exhibit 1. Finding no clear error, we affirm both findings.[21]

### 2. Exhibit 2

■ "Exhibit 2" consisted of an extensive list of furnishings, appliances, and assorted miscellaneous items stored in the shed,[22] the total value of which Fyffe estimated to be almost $5,400. The superior court found that Fyffe and Pierce failed to prove that the listed furnishings had been removed by Gill, or that the items had actually been left in the shed at all. The court based this decision on (1) Fickle's testimony that the contents of the shed "consisted principally of cardboard boxes"; (2) testimony that the shed was too small to have contained all of the furnishings and property allegedly stored in it; (3) testimony by Pierce that only Fyffe's personal items (and not furnishings) had been left in the shed; and (4) the fact that Fyffe's complaint had "identified the collectibles, and not any furnishings, as the primary items of loss." Thus, the court awarded nothing to Fyffe and Pierce for the items listed in Exhibit 2.

Fyffe takes issue with the superior court's evaluation of the conflicting testimony at trial. We reject her arguments; determining witness credibility is the trial court's responsibility in a bench trial[23] and we cannot say that the court's findings are clearly erroneous. Fyffe also disagrees with the court's finding that it is "highly improbable" that "all of the furnishings identified on Exhibit 2" could have fit in the shed. Fyffe states that "[t]he Court's decision is based on its own theory of proportion." She asserts that the size of the shed gave "ample room to store all of the chattels described in [E]xhibits 1–6." Determining the capacity of the shed and the volume of Fyffe's personal property is a fact-intensive issue for which the superior court is better-equipped than this court. The superior court's determination was well within its discretion in light of the weight of the other evidence presented, and its skepticism as to the shed's ability to contain all of the items that Fyffe claimed is not clearly misplaced. The lists of the items in the shed were not compiled until at least several months after the shed was packed, and they were compiled by Fyffe, who had not even been present. In fact, even Fyffe expressed some doubts as to whether Pierce stored all of the items listed in Exhibit 2 in the shed or took them to his new home.

■ Fyffe asserts that the superior court did not award her for the loss of certain chattels because she identified collectibles, and not furnishings, as the primary items of loss in the complaint.[24] But the court did not

19. These consisted of Barbie dolls and accessories, a set of horse farrier tools, and a set of winter tires; Fyffe estimated these items were worth $750.

20. These consisted of Lego sets, baseball and other sports card collections, and two sports memorabilia pictures; Fyffe estimated these items were worth at least $1,500.

21. While Pierce testified that he left some of Tim's belongings in the shed, he also stated that he brought as much of the children's personal property as possible to Anchorage. Pierce also admitted that he did not personally see every item that was left in the shed, and made no list of the shed's contents.

22. The furnishings and appliances allegedly stored in the shed included a washing machine and dryer, a space heater, a love seat, a curio cabinet, a sewing machine and sewing table, two medium size metal desks, several lamps, a glass top display table, three portable tables, a tent, a microwave oven and microwave cart, two typewriters, four "captains chairs," an "octagon end table," a 24″ × 48″ kitchen hutch, a wooden coffee table, a computer, a large wood cutting block, "dishes, glasses, Tupperware, pots and pans, [and] other kitchen supplies," and framed and unframed pictures.

23. *Wasserman v. Bartholomew*, 38 P.3d 1162, 1166–67 (Alaska 2002).

24. Fyffe also complains that "the Court did not apply the same standard when it awarded damages to Wright, who failed to state a claim for relief in her Answer." Fyffe misreads the basis

refuse to compensate Fyffe for her furnishings because of the wording of her complaint. Rather, the court balanced the complaint's wording against the evidence and the court's view of the parties' credibility. The superior court was entitled to weigh the credibility of the parties' testimony against what it viewed as the complaint's paucity of attention to the furnishings.

### 3. Exhibit 3

■ "Exhibit 3" listed ten boxes of Fyffe's clothing, three boxes of home schooling materials for her children, assorted sentimental items, various collectible items and ornaments, a box of tax and financial records, and materials left over from a failed crafts business Fyffe had started; Fyffe estimated the total worth of these items to be $6,800. The superior court found that the items listed had been converted or disposed of by Wright and Gill. The court rejected Fyffe's assertion that her tax records were worth $600; it awarded her nothing for them. The court held that, although the value of the remaining items in the exhibit "may be substantially overstated," such values were the "best evidence" presented, and it awarded Fyffe their claimed value, or $6,200. The superior court's deduction of $600 for the tax records was not clearly erroneous: The value of Fyffe's tax records is entirely speculative.

### 4. Exhibit 5[25]

■ "Exhibit 5" listed Fyffe's entire doll collection (numbering approximately thirty-five dolls) with a claimed value totaling $5,325. For several dolls, Fyffe provided estimated ranges of values that she had derived from a variety of sources (for example, she mused that her grandmother's Kewpie doll could be worth anywhere from $300 to $1,850, but estimated it at $900 in reaching

her total for the list). Where a range of values were provided, the superior court adopted the lowest value. For all other dolls in the list, the court accepted Fyffe's valuations.

The superior court agreed that Gill and Wright were responsible for the loss or destruction of Fyffe's doll collection. However, the court found that Fyffe had unnecessarily delayed her attempts to retrieve the dolls until November 1998, and that this delay had caused the dolls to suffer some damage from exposure to the conditions in the shed. The court therefore halved the total value of the dolls—and awarded Fyffe $1,987.50 for the collection. The evidence shows that Samantha Fyffe had entered the property and retrieved some of her belongings roughly a week after the family vacated. Additionally, Fyffe returned to Alaska in September, yet she did not actually attempt to retrieve her property until November. The court's ruling was not clearly erroneous.

### 5. Exhibit 6

■ "Exhibit 6" listed a book and encyclopedia collection (estimated by Fyffe to be worth $2,550) and a Bradford Exchange plate collection (estimated by Fyffe to be worth $544.80). The superior court held that Fyffe did not prove by a preponderance of the evidence that her book collection had been in the shed and disposed of by Wright or Gill. But the court did find that the collection of Bradford Exchange plates had been packed in the shed and disposed of by Wright or Gill. The court therefore awarded Fyffe only the value of the plates, $544.80. Fyffe asserts on appeal that "[t]he Court's written decision is contrary to the summary of its decision at trial concerning Exhibit 6," because the superior court had acknowledged the existence of

---

of the superior court's decision. The court based its judgment on the credibility of the evidence presented at trial—and not on the virtues of the parties' pleadings. To the extent Fyffe is raising the issue of Wright's inadequate pleadings, she is too late. There is no indication in the case files that Wright actually filed a counterclaim for the relief she was awarded by the superior court. But the court heard Wright's claims for back rent and damages without objection from Fyffe or her attorney. Alaska Rule of Civil Procedure 15(b) provides in part that "[w]hen issues not raised by

the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Accordingly, Fyffe has waived any right to appeal Wright's failure to file a formal counterclaim.

25. Because the superior court awarded Fyffe the total amount claimed in Exhibit 4, she does not appeal this portion of the court's decision.

the books listed in Exhibit 6 at the conclusion of the trial, but then "stated the plaintiffs did not establish the books were in the shed in its written decision." Fyffe asserts that this indicates the court's bias against her. Fyffe is wrong.

█ First, the court's oral summary at trial was, as the court explicitly stated at the time, its "tentative thoughts," not a "complete decision." The court specifically stated that it would review its conclusions "more carefully" before issuing a written decision. Second, the court did not rule from the bench that Fyffe had proven that her books were in the shed; rather, it indicated that, even assuming the books had been in the shed, Fyffe had overvalued them. Finally, we have held that, as a general rule, "where inconsistencies exist between a court's written findings and its oral statements, the written findings control,"[26] unless "the written order is so contradictory to the oral decision 'that its usefulness is impaired.'"[27] There is no necessary contradiction between the oral and written decisions of the superior court on this issue. We uphold the court's written decision.

### C. The Superior Court Did Not Err in Denying Fyffe's Claim for Intentional Infliction of Emotional Distress.

█ Fyffe asserts that the superior court erroneously denied her intentional infliction of emotional distress (IIED) claim. In order to recover for IIED a party must show: (1) extreme and outrageous conduct, (2) that is intentional or reckless, (3) and causes emotional distress (4) that is severe.[28]

Fyffe discusses at length the "extreme and outrageous conduct" required under Alaskan law for an award of IIED. She notes correctly that we have held that such conduct is similar to that required for an award of punitive damages.[29] She seems to suggest that because the superior court awarded her penal damages under AS 34.03.260, it should award damages for IIED as well. But Wright does not contest the outrageousness of her own conduct, and Wright's behavior was not an issue in the superior court's ruling. Rather, the court denied Fyffe's claim because she failed to prove the requisite severity of her own emotional distress. To the extent that Fyffe is asserting that any defendant found liable for penal damages must automatically be liable for IIED, she is incorrect. Penal damages under AS 34.03.260 are determined by the behavior of the defendant only.[30] A successful claim of IIED, on the other hand, also depends on the effects of a defendant's behavior upon the plaintiff. Furthermore, AS 34.03.260(d) allows an award of penal damages even against a landlord who violates the statute negligently. But to prevail on a claim for IIED, the plaintiff must prove at least recklessness on the defendant's part.[31] In short, the superior court was not required to decide in Fyffe's favor on her IIED claim merely because it had awarded her penal damages under AS 34.03.260(d).

The superior court denied Fyffe's IIED claim because she failed to prove that her emotional distress was sufficiently severe.[32]

26. *K.T.E. v. State*, 689 P.2d 472, 477 (Alaska 1984).

27. *Id.* at 477 n. 8 (quoting *City of Anchorage v. Steward*, 374 P.2d 737, 739 (Alaska 1962)).

28. *Teamsters Local 959 v. Wells*, 749 P.2d 349, 357 (Alaska 1988).

29. *Richardson v. Fairbanks N. Star Borough*, 705 P.2d 454, 456 (Alaska 1985).

30. AS 34.03.260(d).

31. *Lybrand v. Trask*, 31 P.3d 801, 803 (Alaska 2001).

32. Fyffe suggests that the superior court's decision is contrary to this court's decisions in *Lan-ders, Richardson,* and *Murray,* which allowed plaintiffs alleging only personal property loss to recover for IIED. Fyffe misunderstands the meaning of these cases and the superior court's legal reasoning. All three cases did allow IIED based on the loss of personal property. But all three cases also demanded that the claimant prove each required element of IIED. See *Landers v. Municipality of Anchorage,* 915 P.2d 614, 619, n. 15 (Alaska 1996) (plaintiff did not claim IIED, lacking proof of defendants' intent); *Murray v. Feight,* 741 P.2d 1148, 1158 (Alaska 1987) (plaintiff showed severe emotional distress resulted from defendant's forcible entry onto and confiscation of plaintiff's property following recent sudden death of plaintiff's daughter); and *Richardson v. Fairbanks N. Star Borough,* 705 P.2d at 456–57 (plaintiffs failed to prove severity of emo-

We have upheld a definition of severe emotional distress as "distress of such substantial quality or enduring quantity that no reasonable person in a civilized society should be expected to endure it."[33] "Examples of serious emotional distress may include 'neuroses, psychoses, chronic depression, phobia, and shock.' However, temporary fright, disappointment or regret does not suffice under this standard."[34] Fyffe asserts that she was "extremely distraught over the theft of her chattels," and that the severity of her emotional distress "was the one fact both parties agreed on." But there was no such agreement.[35] And such claims tend to arise from much more egregiously reprehensible behavior by defendants than those exhibited by Wright in the present case. Finally, a determination of the severity of a plaintiff's emotional distress is left to the fact-finder.[36]

When a plaintiff's only evidence of the severity of her emotional distress is the testimony of sympathetic witnesses, the decision to award nothing for her IIED claim is clearly within the fact-finder's discretion.[37] Fyffe has presented no evidence of severe emotional distress beyond her testimony and that of her immediate family members—presumably sympathetic witnesses. The superior court did not abuse its discretion by concluding that Fyffe's evidence was insufficient to support her claim for IIED.[38]

### D. The Superior Court's Penal Damages Award Did Not Constitute an Abuse of Discretion.

Fyffe claims that the superior court erred in its determination of penal damages. Fyffe's argument on this point consists of two assertions: the penal damages in this case must equal the actual damages, and the superior court awarded Fyffe far too little in actual damages. Fyffe is wrong on both counts.

Alaska Statute 34.03.260(d) provides that a landlord found in violation of its other provisions (as Wright was) "is liable for actual damages and penal damages . . . not to exceed actual damages." Fyffe reads this language to mean that, under AS 34.03.260(d), penal damages are determined from the amount of actual damage. Therefore, Fyffe claims that by awarding her only $5,000 in penal damages—an amount less than her actual damages award—the superior court erred in its interpretation of AS

---

tional distress). Here, the superior court did not deny Fyffe's claim because it was based on the loss of personal property. It denied the claim because Fyffe failed to prove the severity of her emotional distress.

33. *Teamsters Local 959*, 749 P.2d at 359 n. 14.

34. *Chizmar v. Mackie*, 896 P.2d 196, 204–05 (Alaska 1995) (quoting *Lejeune v. Rayne Branch Hosp.*, 556 So.2d 559, 570 (La.1990)). "Serious emotional distress" and "severe emotional distress" have been used interchangeably by this court. *See Cameron v. Beard*, 864 P.2d 538, 549 (Alaska 1994).

35. Fyffe apparently mistakes allegations by Wright and others that Fyffe was "explosive" and "agitated" on certain occasions for a concession that she suffered from severe emotional distress. We have refused to find the requisite severity of emotional distress where a plaintiff asserted that the defendant's actions had made him "aggravated," "angry," "upset," "red in the face," or "bothered," and caused him "emotional distress and mental anguish." *Nelson v. Progressive Corp.*, 976 P.2d 859, 868 (Alaska 1999).

36. *Chizmar v. Mackie*, 896 P.2d at 205.

37. *See Nelson v. Progressive Corp.*, 976 P.2d at 868 (plaintiff's evidence of emotional distress consisted only of testimony by plaintiff and his father). We note that in cases tried before a jury, "as a threshold matter, the court must determine 'whether the severity of the emotional distress and the conduct of the offending party warrant an instruction on intentional infliction of emotional distress.' " *Chizmar*, 896 P.2d at 208 (citations omitted).

38. Fyffe also claims that the superior court violated Alaska Rule of Civil Procedure 52(a), by failing to clearly and explicitly explain the findings of fact and conclusions of law underlying its refusal to award IIED. This court has held that a superior court's findings are sufficiently "clear and explicit" to satisfy Rule 52(a) if they resolve all critical areas of dispute in the case, and are sufficiently detailed to allow for meaningful appellate review. *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 537 (Alaska 2001). In this case the superior court's discussion of *Landers v. Municipality of Anchorage*, 915 P.2d 614, 619 (Alaska 1996) (party claiming IIED must demonstrate both severity of emotional distress and bad conduct of offending party), while brief, suffices to explain its relevant conclusion of law and finding of fact.

34.03.260(d). Fyffe's argument is basically that the words "not to exceed" should be read instead as "equaling." Fyffe cites no authority or legislative history to support this interpretation.[39] This reading of the statute is at odds with both the plain meaning of the text and common sense. Under AS 34.03.260(d) punitive damages are *limited* by actual damages, not calculated according to them. In short, this argument has no merit.

■ Fyffe also asserts that the superior court "randomly awarded" her $5,000 in punitive damages. We have held that punitive damages awards should not be "arbitrary,"[40] and that they should "bear some reasonable relationship" to compensatory damages awards.[41] But there is no prescribed ratio between compensatory and punitive damages.[42] We cannot say that the superior court's decision to award Fyffe $5,000 represents a clear error, abuse of discretion, or miscarriage of justice.

### E. The Superior Court Did Not Commit Reversible Error by Refusing To Award Attorney's Fees and Costs.

■ Fyffe appeals the superior court's denial of her request for fees and costs. Fyffe's complaint included a general request for fees and a request for damages for time loss in researching this action. The superior court denied Fyffe's motion for fees.[43]

■ Fyffe had an attorney at trial, but she was unrepresented during at least part of the pre-trial period. Fyffe has not had counsel on this appeal. Fyffe did not claim attorney's fees for any of the hours billed by her trial attorney in her Motion to Reconsider, and she does not do so on appeal. Even a *pro se* litigant waives a claim where she does not raise it in superior court or on appeal.[44] Accordingly, the issue on appeal is whether Fyffe can recover the fees she claims for her own legal work. Prevailing *pro se* litigants who are not attorneys may not recover legal fees in Alaska.[45] Since Fyffe is not an attorney, she cannot recover anything for her own time and effort spent litigating this case.

■ Fyffe also moved for reimbursement for costs and expenses. Citing Alaska Rule of Civil Procedure 79(b), the court denied the motion on the ground that the motion was untimely. As a general rule, Civil Rule 79(a) allows a prevailing party to recover litigation costs. But it is limited by Rule 79(b), which provides: "To recover costs, the prevailing party must file and serve an itemized and verified cost bill, showing the date costs were incurred, within 10 days after the date [of

39. We interpret Alaska's statutes according to reason, practicality, and common sense, *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999), and we normally give unambiguous language its plain meaning. We may also rely on legislative history as a guide to interpretation, but the plainer the language of a statute, the more convincing legislative history must be to interpret the statute in a manner contrary to its plain language. *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1065 (Alaska 2002).

40. *Dena' Nena' Henash v. Ipalook*, 985 P.2d 442, 448 (Alaska 1999).

41. *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 204 (Alaska 1980).

42. *Norcon, Inc. v. Kotowski*, 971 P.2d 158, 175–77 (Alaska 1999).

43. The superior court denied fees based on its reading of Alaska Rule of Civil Procedure 82. Civil Rule 82(c) states that "[a] motion [for attorney's fees] is required for an award of attorney's fees under this rule ... [which] must be filed within 10 days after the date shown in the clerk's certificate of distribution on the judgment." The court held that Fyffe failed to meet the ten-day deadline. However, Alaska's Uniform Residential Landlord and Tenant Act forms the basis for Fyffe's suit, and for the court's decision to award her actual and punitive damages. Fyffe notes correctly that attorney's fees for claims arising out of Alaska's URLTA should be governed by AS 34.03.350, not Civil Rule 82. Alaska Statute 34.03.350 provides that "[a]ttorney fees shall be allowed to the prevailing party in any proceeding arising out of this chapter, or a rental agreement." It has no time limit. Because a *pro se* litigant is not entitled to attorney's fees for her own legal work (as discussed *infra*), the superior court's error in relying on Rule 82(c) to reject Fyffe's request for fees was harmless.

44. *Pieper v. Musarra*, 956 P.2d 444, 446 (Alaska 1998); *A.H. v. W.P.*, 896 P.2d 240, 243–44 (Alaska 1995).

45. *Shearer v. Mundt*, 36 P.3d 1196, 1198 (Alaska 2001).

final judgment]." The superior court's Memorandum Decision was dated April 22, 2002. Fyffe did not file a cost bill as required by Civil Rule 79(b). The superior court was therefore correct in its denial of Fyffe's request for costs.

Fyffe argues that the superior court's decision was insufficiently "clear and explicit" to meet the standards of Alaska Civil Rule 52(a), which requires the trial court to make findings of fact and state conclusions of law in cases tried without a jury. But Rule 52(a) makes clear that findings of fact and conclusions of law are "unnecessary on decisions of motions under Rules 12 or 56 *or any other motion* except as provided in Rule 41(b) [dealing with dismissal of causes of action]." (Emphasis added.) Since a prevailing party can recover costs only after trial, the superior court was not required to address the request for costs in Fyffe's complaint. Fyffe failed to file the required cost bill. Therefore, the superior court was not required to issue findings of fact or conclusions of law when it denied Fyffe's request for costs.

In sum, the superior court did not err in denying both attorney's fees and costs to Fyffe.

## V. CONCLUSION

For the reasons above, we AFFIRM the superior court's decision in all respects.