NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Protective | ) | |
| Proceedings of | ) | Supreme Court No. S-14027 |
| | ) | |
| MELISSA A. | ) | Superior Court No. 4FA-10-00348 PR |
| | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND JUDGMENT* |
| | ) | |
| | ) | No. 1410 - February 8, 2012 |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Robert B. Downes, Judge.

Appearances: Mia A., pro se, Fairbanks, Appellant. Michael G. Hotchkin, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee State of Alaska, Department of Health and Social Services, Office of Children's Services.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices. [Christen, Justice, not participating.]

I.      INTRODUCTION

The Office of Children's Services petitioned for appointment of a guardian with powers of conservatorship over a developmentally disabled adult woman. The superior court entered an order appointing the public guardian. The woman's mother appeals the superior court's order. Because the superior court did not abuse its discretion

_____

*        Entered pursuant to Alaska Appellate Rule 214.

when it found the woman's uncle unqualified to serve as either guardian or conservator, and because the mother did not request appointment, we affirm the superior court's order in all respects.

## II.    FACTS AND PROCEEDINGS[1]

### A.    Facts

Mia A. is Melissa A.'s mother.[2]  Melissa is a 20-year-old woman who is developmentally disabled.  Melissa is diagnosed with Fragile X Syndrome, a significant cause of mental retardation in women.  Melissa also often exhibits echolalia.[3]  As a result of her disabilities, Melissa is "unable to make sound decisions regarding her health, welfare, finances, or other common legal matters handled by competent adults, and she will require lifelong assistance."  Functionally, she operates at a six-year-old's ability level and "requires 24-hour support and supervision."  She is incapable of independent living.

In June 2008, when Melissa was 16, she was taken into emergency custody by the State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS).  Between June 2008 and February 2009, Melissa alternated living with a foster parent and living with relatives.  In March 2009, following mediation between the parties, OCS released custody of Melissa back to Mia.  In June 2009, OCS received

---

[1]    A substantial portion of this section — many of the facts and much of the procedural history — is adopted from the Report of the Court Visitor for Initial Guardianship/Conservatorship.  This report was introduced at the December 21, 2010 hearing without objection and the superior court relied on the report's findings in its final determination.

[2]    Pseudonyms have been used for all family members to protect their privacy.

[3]    Echolalia is a condition in which an individual repeats vocalizations made by another person.

a report of neglect stating that Melissa was living in a storage unit with Mia. After OCS verified that report, Melissa was placed back into foster care. In November 2009, shortly before Melissa's 18th birthday, the superior court adjudicated Melissa as a child in need of aid under AS 47.10.011(6),[4] (9),[5] and (11).[6] The superior court committed Melissa to OCS custody through December 30, 2010, the date of her 19th birthday.

## B.    Proceedings

In July 2010, OCS filed a Petition for Appointment of a Guardian and Conservator over Melissa. On October 1, 2010, OCS was notified that there was a space available at the Fairbanks Resource Agency, an assisted-living residential home. OCS filed an Emergency Petition for Appointment of Temporary Guardian with Conservatorship Powers over Melissa. OCS requested that the Office of the Public Guardian be appointed Melissa's guardian so that Melissa could be moved immediately into the Fairbanks Resource Agency unit. An uncontested hearing was held on October 7, 2010. On October 11, 2010, Office of Public Advocacy (OPA) was appointed Melissa's temporary guardian. The court recognized both Mia and Mia's brother, John A., as interested parties. Three days later, at an October 14, 2010 hearing, Melissa was released from OCS custody.

---

[4]    " [T]he child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately."

[5]    "[C]onduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect."

[6]    "[T]he parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury."

On December 7, 2010, the court visitor, Carrie Gilmore, filed her report, in which she considered whether either Mia or John would be appropriate guardians for Melissa. Gilmore concluded that she "does not believe either family member is currently an appropriate choice for appointment." Gilmore based her conclusions regarding Mia after "a not insignificant amount of time reviewing available records, talking with [Mia], and interviewing caregivers and resource providers who have interacted with [Mia] and her family over the past years." Gilmore based her conclusions regarding John on conversations with him immediately following the emergency petition hearing and additional conversations in preparation for her report. The following are excerpts from Gilmore's report on John:

> [John] made clear that if he were appointed as [Melissa's] Guardian, he planned to take her to the Philippines with the intent of leaving her there with family permanently. . . .
> [John] indicated that he was unwilling to be the Guardian if [Melissa] lived in housing other than his own or that of his family. . . . When the visitor explained that many wards do not live with their Guardians, [John] made clear [that] he did not wish to be Guardian without control over housing.
> When this visitor made inquiries with the local [s]ocial [s]ecurity office regarding [John], it was made perfectly clear that the agency would not consider [John] as a Representative Payee based on past dealings with [him]. . . .
> Considering [John 's] intent to remove [Melissa] from her current housing and his desire to permanently take her out of the country, and based upon the concerns raised by [John's] past interactions with the social security office, the visitor cannot recommend [John] as Guardian or Conservator.

On December 21, 2010, a hearing was held regarding OCS's petition for the appointment of a full guardian with powers of conservator over Melissa. Melissa's

incapacity was stipulated to and is not at issue on this appeal. The only issue at the hearing was who should be Melissa's guardian and conservator.

The court heard testimony from John regarding his request to serve as Melissa's guardian. When asked whether he would comply if Melissa could not be moved from Fairbanks Resource Agency housing without a court order, John responded: "I feel that if I'm going through with this guardianship hearing, what - let's say I'm approved to be a guardian. So what is my role, if I can't make any decision . . . ?" When asked if he would like more control over where Melissa lives, John responded: "At least I should have some control . . . ." John further testified that he has never dealt with Melissa's benefits and that he has been told by social security that he is ineligible to be Melissa's representative payee.

Mia did not request to be appointed guardian or conservator. Robert Noreen, Melissa's guardian ad litem, stated that Mia "feels that she was denied an attorney by the judge, so she's indicated she has nothing additional to say."

On December 27, 2010, OPA was appointed to serve as Melissa's full guardian with powers of conservatorship. John was found unqualified to serve as either guardian or conservator. Mia appeals the appointment of OPA as Melissa's full legal guardian with powers of conservatorship.

## III.    STANDARD OF REVIEW

"The initial selection of a guardian or conservator for an incapacitated person is committed to the sound discretion of the superior court."[7] We will review that selection for abuse of discretion.[8] "The superior court abuses its discretion if it considers

---

[7]    *H.C.S. v. Cmty. Advocacy Project of Alaska, Inc.*, 42 P.3d 1093, 1096 (Alaska 2002).

[8]    *Id.*

improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[9]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Appointing The Public Guardian As Melissa's Full Legal Guardian With Powers Of Conservatorship.

#### 1. The superior court did not abuse its discretion in finding John unqualified to serve as Melissa's guardian or conservator.[10]

In its Order Appointing Full Guardian with Powers of Conservator, the superior court stated that, although OPA does not have priority for appointment, the appointment of OPA as both guardian and conservator "is in the best interest of the respondent . . . because no one with priority is qualified to serve." Mia contends that it was error to appoint the public guardian as Melissa's full legal guardian with powers of conservatorship rather than appoint her or her brother, John, to serve as guardian or conservator. OPA contends that neither Mia nor John is qualified.

Adult guardianship and conservatorship proceedings are governed by AS 13.26.001-.013, .090-320, and .360-.410, as well as by Alaska Probate Rules 1-4.5, 14, 16, 17, and 19. Generally, AS 13.26.145(d)[11] and 13.26.210(d)[12] provide a statutory

---

[9]    *Id.*

[10]    John did not file an appeal in this case. We assume without deciding that Mia has standing to appeal on John's behalf.

[11]    Regarding appointment of guardians, AS 13.26.145(d) provides:

Subject to (e) and (f) of this section, qualified persons have priority for appointment as guardian in the following order:

. . . .

(3) an adult child or parent of the incapacitated person;

(continued...)

preference for parents and relatives to be appointed guardian or conservator of an incapacitated person. But AS 13.26.145(d) and AS 13.26.210(d) govern the appointment of a guardian or conservator only where more than one individual or organization is qualified to serve.[13] In the present case, the superior court determined that no one who would have statutory priority was qualified to serve.

---

[11]    (...continued)

> . . . .

>> (5) a relative or friend who has demonstrated a sincere, longstanding interest in the welfare of the incapacitated person;

>> . . . .

>> (7) the public guardian.

[12]    Regarding appointment of conservators, AS 13.26.210(d) provides:

> Subject to (e) and (f) of this section, qualified persons have priority for appointment in the following order:

>> . . . .

>> (3) an adult child or a parent of the protected person;

>> . . . .

>> (5) a relative or friend of the protected person who has demonstrated a sincere and longstanding interest in the welfare of the protected person;

>> . . . .

>> (7) the public guardian.

[13]    Had the superior court determined that John was both qualified and had priority over OPA, the superior court would have been required to "make appropriate written findings related to why the best interests of the respondent require appointment of the person with a lower priority." AS 13.26.145(f).

OPA contends that the superior court did not abuse its discretion in determining that John is unqualified to serve as guardian or conservator. OPA first points to the court visitor's report, which concluded that John was not "an appropriate choice." In her report, the court visitor mentioned conversations with John in which he "made clear that if he were appointed as [Melissa's] Guardian, he planned to take her to the Philippines with the intent of leaving her there with family permanently." The court visitor noted that John "indicated he was unwilling to be the Guardian if [Melissa] lived in housing other than his own or that of his family." The court visitor also found that "[Melissa] is blossoming in her current services" and noted that "all the professional caregivers and resource providers involved with [Melissa] unanimously expressed their concerns with the notion of permanently removing [Melissa] from the country." Finally, the court visitor found that the local social security office has "made perfectly clear that the agency would not consider [John] as a Representative Payee based on past dealings with [him]."

OPA also points to John's testimony during the December 21, 2010 guardianship hearing. During the hearing, John expressed reluctance at being appointed guardian without being able to control where Melissa lives, asking "[s]o what is my role, if I can't make any decision . . . ?"[14] John also confirmed that he is unable to serve as representative payee.

We agree with OPA that the superior court did not abuse its discretion when it found John unqualified to serve as guardian or conservator for Melissa. John's

_____

[14] John's testimony at the guardianship hearing also implied that he might respect restrictions placed on Melissa's place of residence. But his conflicting statements on this topic are cause for concern, and the superior court is the court best able to assess the credibility of a witness, which it implicitly did with respect to John's conflicting statements. *See Adams v. Adams*, 131 P.3d 464, 467 (Alaska 2006); *Fyffe v. Wright*, 93 P.3d 444, 451 (Alaska 2004).

inability to act as representative payee for social security payments would pose a serious threat to Melissa's financial well-being. John's statements to the court visitor and during the guardianship hearing raise significant concerns about his ability to provide for Melissa's needs, particularly in relation to maintaining a stable residence for her. Based on the above facts, it was not an abuse of discretion to find John unqualified.

**2.      The superior court did not abuse its discretion in appointing the public guardian rather than Mia to serve as Melissa's guardian or conservator.**

OPA contends that the superior court did not abuse its discretion in appointing the public guardian because Mia did not request to be appointed guardian or conservator during the guardianship proceedings. At the December 21, 2010 hearing, after stating that John wished to be considered as a guardian, Melissa's guardian ad litem advised the court that "[t]he mother feels that she was denied an attorney by the judge, so she's indicated that she has nothing additional to say." Mia did not testify at the hearing or otherwise object to the guardian ad litem's statement.

We agree with OPA that the superior court did not abuse its discretion in not appointing Mia because Mia did not request appointment as guardian or conservator.[15]

## V.      CONCLUSION

Because the superior court did not abuse its discretion when it found John unqualified to serve as either guardian or conservator, and because Mia did not request appointment, we AFFIRM the decision of the superior court in all respects.

---

[15]      In her appellant's brief, Mia also contends that the superior court did not properly adhere to all required procedural requirements of a guardianship and conservatorship proceeding. We find no procedural irregularities represented in the record and affirm the superior court's procedure.